1

2

3

4

5

6

7

8                     UNITED STATES DISTRICT COURT

9                  FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   DONALD ORTEZ-LUCERO,                    No.  2:18-cv-2982-KJM-EFB P

12                    Petitioner,

13        v.                                 FINDINGS AND RECOMMENDATIONS

14   SHAWN HATTON,

15                    Respondent.

16

17        Petitioner is a California state prisoner who, proceeding with counsel, brings an

18   application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  He was convicted in the

19   Sacramento County Superior Court of: (1) two counts of first degree murder[1] (Pen. Code

20   § 187(a)); (2) first degree burglary (§ 459); and (3) attempted robbery (with firearm

21   enhancements) (§ 664/211).  The instant petition raises five claims.  First, petitioner argues that

22   the trial court committed prejudicial error when it excluded exculpatory wiretap evidence.

23   Second, petitioner argues that the state court erred in excluding evidence as to a victim's criminal

24   background.  Third, petitioner argues that the trial court erred in denying his request for a jury

25   instruction on third-party culpability.  With respect to this (third) claim, petitioner also argues that

26

27   _____
          [1] These counts had three special circumstances attached: (1) murder in the commission of
28   a burglary; (2) murder in the commission of attempted robbery; and (3) multiple murders.  Pen.
     Code §§ 12022.53 (b), (d).

                                        1

his trial counsel was ineffective for delaying the instruction request. Fourth, petitioner argues that the trial court erred when it informed the jury that a witness, Jermaine Hollie, refused to testify. Fifth, he argues that cumulative error warrants issuance of the writ.

For the reasons stated below, the petition should be denied in its entirety.

## FACTUAL BACKGROUND

### The Events of September 14, 2007

On September 14, 2007 at approximately noon, a south Sacramento drug dealer named Frederick Gill was discussing business with a buyer. While Gill was doing business, Sean Aquitania called and stated his intent to come to Gill's house with his infant son. The two men were friendly and Aquitania wanted Gill to see his baby before the latter turned himself in on a jail commitment.

Unfortunately, petitioner and his associate – Christopher Strong – were nearby and, having heard that Gill had several kilos of cocaine, intended to rob him. Petitioner and Strong approached Gill's house and found Aquitania sitting in his car outside. The car door was open and petitioner approached Aquitania. Petitioner intended to force Aquitania to assist him in gaining access to Gill's house and, to that end, struck him in the head with his gun. The gun discharged and the bullet struck Aquitania's infant son in the head.

Petitioner and Strong removed Aquitania from his car and, together, they approached Gill's house. Gill opened the front door and was quickly subdued. Gill and Anthony Palmer – another man who was staying with Gill at that time – were thrown to the ground and zip tied by Strong. Strong demanded money from Gill and Palmer while petitioner held Aquitania at gunpoint by the door. Gill's buyer, who was in the back of the house, managed to escape through a window.

Aquitania asked petitioner and Strong to let him go tend to his son. The robbers allowed him to go and told him they would deal with him later. Aquitania returned after discovering the gunshot wound to his infant son and, understandably enraged, began attacking petitioner. Strong moved to aid petitioner and, in the ensuing fight, Gill and Palmer managed to escape the house.

/////

2

At some point during the fight, Aquitania tried to take Strong's gun, prompting the latter to tell petitioner to shoot. Petitioner fired twice and hit Aquitania both times. One of the bullets went through Aquitania and hit Strong in the leg. Strong and petitioner then fled.

After having the zip ties removed by a neighbor, Gill returned to his house and discovered Aquitania dead on the floor. Gill placed various items related to his drug trade in a garbage bag and told Palmer to take the bag before the police arrived. He then went to Aquitania's car and discovered the baby. Gill collected the child and ran while attempting to apply pressure to the wound with his hand. He ultimately flagged down a school bus. He gave the child to the driver and returned to his house to await the authorities. The infant was taken to a hospital but did not survive.

<u>Investigation</u>

Gill and Palmer could not identify the robbers. They described the African-American robber (Strong) as over six feet tall and stocky, with a hooded sweatshirt and a bandana or mask concealing his face. They noted that Strong had brandished a large chrome revolver. Gill stated that the Hispanic robber (petitioner) was shorter and had a lighter frame. Gill recalled that petitioner wore a white and green Oakland A's hat and a white shirt. Palmer was in agreement with Gill as to the A's hat but remembered petitioner as having worn an A's jersey as well.

Ballistic evidence indicated that each of the three bullets (one of which hit the infant, two of which hit Aquitania) had been fired by the same Glock. Investigators reached this conclusion from three recovered cartridges and two recovered bullets. Despite their best efforts, investigators could not find the third bullet – leading them to conclude that one of the robbers had also been shot.

On December 18, 2007, a detective interviewed Sarah Roberts, who lived across from petitioner. Roberts had contacted police after seeing a circulated composite sketch which she believed resembled a man she knew – Richard Noguera. Based on that interview, investigators obtained a search warrant for Roberts's phone records which indicated that, on the day of the shooting, multiple calls had been made between Roberts and a man named Noguera.

/////

Noguera had lived with petitioner at the latter's house in West Sacramento at the time of the shootings. He sold marijuana and had two cellphones – one for personal use and one for his drug deals. Investigation continued and approximately two years[2] after the interview with Roberts, a detective learned of a domestic violence incident between Noguera and a woman named Kameka Grant. During the incident, Noguera told Grant that he had committed the murder of Aquitania and his son. Grant gave detectives several cell numbers which belonged to Noguera and they obtained a search warrant for his phone contacts.

Based on his admission to Grant, Noguera was arrested for the murders. He told multiple lies and was not initially forthcoming. He omitted, for instance, that he had gone to the Bay Area on the day of the shooting and relayed that information only when detectives informed him that his cell records placed him there.

On February 5, 2011, a detective interviewed petitioner, having gleaned from previous investigation that he might be involved in some way. The detective asked whether petitioner associated with any individuals named "Chris" - a name that Grant had referenced in her conversations with police and whether he could provide a last name for such a person. Petitioner denied being able to. Phone records revealed, however, that after the interview petitioner dialed Christopher Strong.

On October 5, 2011, detectives obtained a DNA sample from petitioner. That sample profile matched fingernail scrapings taken from Aquitania during the autopsy. Approximately a week later, petitioner was arrested for the murders. Days later, Noguera was also arrested for the murders. An arrest warrant for Strong was obtained in January of 2012. The charges against Noguera were ultimately dropped in March of 2012. He was given immunity in exchange for his testimony.

Cell phone records indicated that petitioner's phone had dialed Noguera shortly after 1:00 p.m. on the day of the shooting. Between 2:20 p.m. and 2:30 p.m., petitioner's phone location

---

[2] During the intervening time, detectives continued the investigation by, *inter alia*, re-interviewing Palmer, Gill's buyer, and following tips received after the crime was chronicled on America's Most Wanted.

1  was consistent with a vehicle travelling south on Highway 99.  It reached the Foster City/San

2  Mateo area at around 3:40 p.m. and stayed there until at least 6:15 p.m.  Noguera's phone was

3  placed en route along the I-80 corridor by 4:39 p.m.  It reached San Mateo by 6:11 p.m.

4  Noguera's phone returned to Sacramento by 9:28 p.m.  Petitioner's phone passed through Davis

5  at 11:00 p.m. and made a call from petitioner's house at 7:22 a.m. the next morning.

6  <center>Prosecution Testimony</center>

7  A.    <u>Noguera's Testimony</u>

8  Noguera testified that, on the day of the shootings, he was at petitioner's house with a

9  woman named Janey Hughes.  He heard pounding on the door and opened it to discover petitioner

10  supporting Strong, who had blood on his pants and a limp.  Petitioner was wearing the A's hat

11  and shirt described by Palmer and Strong was in a black hooded sweatshirt.  Noguera also saw

12  that petitioner was in possession of Aquitania's identification card.

13  Noguera took Hughes home and then returned to petitioner's house.  He drove Strong to a

14  Bay Area apartment owned by Fred Wilson (Strong's cousin).  Petitioner and Wilson were

15  already there.  Petitioner asked Noguera took to take apart a black Glock handgun.  Later that

16  night, Noguera, petitioner, and Strong drove back to Sacramento.  After seeing news of the

17  shooting on television, petitioner and Strong admitted their culpability to Noguera.

18  The following day, Noguera cleaned blood off the interior of the car used by petitioner

19  and Strong during the attempted robbery.  The car was a rental used by Noguera and, three days

20  after washing it, he returned it in order to avoid suspicion.

21  The second day after the shooting, a woman (whom Noguera could not identify) came to

22  petitioner's house with Jermaine Holly – an individual known to petitioner and Strong.  She

23  removed the bullet from Strong's leg.

24  Noguera testified the petitioner owned an A's cap like the one described by Gill and

25  Palmer.  He also gave testimony related to firearms – noting that petitioner owned a Glock and

26  Strong owned a long-barreled chrome revolver.

27  /////

28  /////

<center>5</center>

B.      Sarah Roberts' Testimony

As noted *supra*, Roberts lived across from petitioner's house.  She testified that Noguera had called her several times on the day of the shootings.  In one call he informed her that "something bad" had happened, that he needed to get rid of some Ecstasy pills, and that he was in the Bay Area.  In another call (or possibly the same – Roberts could not recall at the time of trial) he told her that "Chris" had been shot in the leg.  Later that evening, Noguera came to Roberts' house and told her to turn on the news.  The news covered the shooting of Aquitania and his son.  Upon seeing the story, Roberts recalled that Noguera "got kinda weird" and left abruptly.

C.      Janey Hughes

Hughes dated Noguera from August to December of 2007.  She corroborated Noguera's testimony about being at petitioner's house on the day of the shooting.  Hughes remembered petitioner and Strong returning, the latter with a blood stain on his pants and a limp.  Noguera took Hughes back to her home shortly thereafter.

Hughes saw Strong again later that year during a Halloween party at petitioner's house.  He was on crutches and she overheard him say "I got shot" when asked what had happened to his leg.

D.      Kameka Grant

Grant stated that she began dating Noguera in October of 2007 (she was uncertain as to the exact month, offering a qualifying "maybe") and that she lived with him until the end of 2009.  She testified that, at some point in the fall of 2007, she accompanied Noguera and Strong on a car trip from Sacramento to the Bay Area.  Grant stated that Strong had an injured leg and limped as he exited the vehicle.  Grant asked the men about the injury and they evasively offered jokes instead of serious answers.

As noted *supra*, a domestic incident occurred between Grant and Noguera in December of 2009.  She testified that Noguera hit her in the head with a gun and threatened to kill her.  Argument ensued and Noguera, who was inebriated, began relating his nightmares about a baby he had shot.  He began to cry and told Grant that, in haunting dreams, he heard the baby screaming.  Noguera said that neither the baby nor its father were supposed to have been there;

that he was forced to kill the father because he had shot the baby. He mentioned that "Chris" and "Don" (petitioner) had been involved in the incident and that the former had gotten hurt. Noguera made the wild claim that he had murdered no less than twenty-seven people. Eventually he passed out. Grant called the police and they took Noguera into custody that night.

E.     Lashaun Burch

Ms. Burch was a licensed vocational nurse and was, at one point, married to Jermaine Hollie aka "Hollywood." She testified that, at some point in 2007, Hollie asked her to help a friend with a hurt leg. Burch agreed to help and Hollie drove her to a house in Natomas, near a freeway. At the house, she saw an African-American man, approximately twenty-five or thirty years old, with his knee propped on a couch. Burch also remembered a Latino man seated nearby.

Burch remembered the African-American man's knee wound as being circular and roughly the size of a nickel. She cleaned it, inserted some gauze, and bandaged it. Burch did not remove the bullet, but told the man that he should see a doctor.

F.     Petitioner and Strong's Girlfriends

Alma Mejia became acquainted with Strong in June of 2007. She travelled to petitioner's house to see Strong on various occasions after that date. Mejia stated that petitioner and Strong "always hung out together" and "considered each other brothers." Strong missed Mejia's birthday in Modesto in September of 2007. When she asked him about it, he claimed to have injured his knee playing basketball. When next she was with him, she noticed that he was limping, and he showed her a knee injury that looked like a bullet wound.

Azaria Ting dated Strong for three to four months in 2007. Strong introduced petitioner to Ting as his brother. She recalled watching petitioner and Strong pass firearms around at house parties. On one occasion, Strong informed Ting that he couldn't see her because he had been shot at a party by a friend.

Catherine Ignacio began dating petitioner in 2003. Like Mejia, she testified that petitioner and Strong had a close, brotherly relationship. She recalled seeing petitioner in possession of an "L-shaped" handgun on several occasions. In 2010, petitioner told Ignacio that detectives had

come to his grandmother's house and asked questions about Noguera and Strong. He stated that, in the event the detectives returned, he might be "gone."

<center>Petitioner's Defense</center>

At trial, petitioner called Frank Dearwester – who was then serving a 32-year prison sentence and claimed to have had conversations with Noguera while the two were housed next to each other in jail. Dearwester claimed that Noguera told him that, in order to create an alibi for the robbery, he instructed his "baby mama" to dial his phone during the time he and an accomplice committed the crime. Dearwester also claimed that Noguera had told him that between five and seven members of the Norteno gang were involved in the crime. Dearwester never received a deal in exchange for his testimony but acknowledged that his reason for coming forward was a desire for such consideration in his own case.

Petitioner also introduced expert forensic analysis indicating that the DNA matching his profile found under Aquitania's finger nails could be the result of "secondary transfer." This raised the possibility, petitioner argued, that his DNA could have been transferred to Noguera who, in turn, could have transferred the DNA to Aquitania when *he* committed the shootings.

<center>STANDARDS GOVERNING HABEAS RELIEF UNDER THE AEDPA</center>

I.      Applicable Statutory Provisions

28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), provides in relevant part as follows:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a state court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim -
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

Section 2254(d) constitutes a "constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus." *(Terry) Williams v. Taylor*, 529 U.S.

<center>8</center>

362, 412 (2000). It does not, however, "imply abandonment or abdication of judicial review," or "by definition preclude relief." *Miller El v. Cockrell*, 537 U.S. 322, 340 (2003). If either prong (d)(1) or (d)(2) is satisfied, the federal court may grant relief based on a de novo finding of constitutional error. *See Frantz v. Hazey*, 533 F.3d 724, 736 (9th Cir. 2008) (en banc).

The statute applies whenever the state court has denied a federal claim on its merits, whether or not the state court explained its reasons. *Harrington v. Richter*, 562 U.S. 86, 99-100 (2011). State court rejection of a federal claim will be presumed to have been on the merits absent any indication or state law procedural principles to the contrary. *Id.* at 784-785 (citing *Harris v. Reed*, 489 U.S. 255, 265 (1989) (presumption of a merits determination when it is unclear whether a decision appearing to rest on federal grounds was decided on another basis)). "The presumption may be overcome when there is reason to think some other explanation for the state court's decision is more likely." *Id.* at 785.

A.     "Clearly Established Federal Law"

The phrase "clearly established Federal law" in § 2254(d)(1) refers to the "governing legal principle or principles" previously articulated by the Supreme Court. *Lockyer v. Andrade*, 538 U.S. 63, 71 72 (2003). Only Supreme Court precedent may constitute "clearly established Federal law," but courts may look to circuit law "to ascertain whether . . . the particular point in issue is clearly established by Supreme Court precedent." *Marshall v. Rodgers*, 569 U.S. 58, 64 (2013).

B.     "Contrary To" Or "Unreasonable Application Of" Clearly Established Federal Law

Section 2254(d)(1) applies to state court adjudications based on purely legal rulings and mixed questions of law and fact. *Davis v. Woodford*, 384 F.3d 628, 637 (9th Cir. 2003). The two clauses of § 2254(d)(1) create two distinct exceptions to AEDPA's limitation on relief. *Williams*, 529 U.S. at 404-05 (the "contrary to" and "unreasonable application" clauses of (d)(1) must be given independent effect, and create two categories of cases in which habeas relief remains available).

9

A state court decision is "contrary to" clearly established federal law if the decision "contradicts the governing law set forth in [the Supreme Court's] cases." *Id.* at 405. This includes use of the wrong legal rule or analytical framework. "The addition, deletion, or alteration of a factor in a test established by the Supreme Court also constitutes a failure to apply controlling Supreme Court law under the 'contrary to' clause of the AEDPA." *Benn v. Lambert*, 283 F.3d 1040, 1051 n.5 (9th Cir. 2002). *See, e.g., Williams*, 529 U.S. at 391, 393 95 (Virginia Supreme Court's ineffective assistance of counsel analysis "contrary to" *Strickland*[3] because it added a third prong unauthorized by *Strickland*); *Crittenden v. Ayers*, 624 F.3d 943, 954 (9th Cir. 2010) (California Supreme Court's *Batson*[4] analysis "contrary to" federal law because it set a higher bar for a prima facie case of discrimination than established in *Batson* itself); *Frantz*, 533 F.3d at 734 35 (Arizona court's application of harmless error rule to *Faretta*[5] violation was contrary to U.S. Supreme Court holding that such error is structural). A state court also acts contrary to clearly established federal law when it reaches a different result from a Supreme Court case despite materially indistinguishable facts. *Williams*, 529 U.S. at 406, 412 13; *Ramdass v. Angelone*, 530 U.S. 156, 165 66 (2000) (plurality op'n).

A state court decision "unreasonably applies" federal law "if the state court identifies the correct rule from [the Supreme Court's] cases but unreasonably applies it to the facts of the particular state prisoner's case." *Williams*, 529 U.S. at 407 08. It is not enough that the state court was incorrect in the view of the federal habeas court; the state court decision must be objectively unreasonable. *Wiggins v. Smith*, 539 U.S. 510, 520 21 (2003). This does not mean, however, that the § (d)(1) exception is limited to applications of federal law that "reasonable jurists would all agree is unreasonable." *Williams*, 529 U.S. at 409 (rejecting Fourth Circuit's overly restrictive interpretation of "unreasonable application" clause). State court decisions can be objectively unreasonable when they interpret Supreme Court precedent too restrictively, when

---

[3] *Strickland v. Washington*, 466 U.S. 668 (1984).

[4] *Batson v. Kentucky*, 476 U.S. 79 (1986).

[5] *Faretta v. California*, 422 U.S. 806 (1975).

10

they fail to give appropriate consideration and weight to the full body of available evidence, and when they proceed on the basis of factual error. *See, e.g., Williams*, 529 U.S. at 397-98; *Wiggins,* 539 U.S. at 526 28 & 534; *Rompilla v. Beard*, 545 U.S. 374, 388 909 (2005); *Porter v. McCollum*, 558 U.S. 30, 42 (2009).

The "unreasonable application" clause permits habeas relief based on the application of a governing principle to a set of facts different from those of the case in which the principle was announced. *Lockyer*, 538 U.S. at 76. AEDPA does not require a nearly identical fact pattern before a legal rule must be applied. *Panetti v. Quarterman*, 551 U.S. 930, 953 (2007). Even a general standard may be applied in an unreasonable manner. *Id.* In such cases, AEDPA deference does not apply to the federal court's adjudication of the claim. *Id.* at 948.

Review under § 2254(d) is limited to the record that was before the state court. *Cullen v. Pinholster*, 131 S. Ct. 1388, 1398 (2011). The question at this stage is whether the state court reasonably applied clearly established federal law to the facts before it. *Id.* In other words, the focus of the § 2254(d) inquiry is "on what a state court knew and did." *Id.* at 1399.

Where the state court's adjudication is set forth in a reasoned opinion, § 2254(d)(1) review is confined to "the state court's actual reasoning" and "actual analysis." *Frantz*, 533 F.3d at 738 (emphasis in original). A different rule applies where the state court rejects claims summarily, without a reasoned opinion. In *Harrington*, *supra*, the Supreme Court held that when a state court denies a claim on the merits but without a reasoned opinion, the federal habeas court must determine what arguments or theories may have supported the state court's decision, and subject those arguments or theories to § 2254(d) scrutiny. *Harrington*, 562 U.S. at 101-102.

C.     Unreasonable Determination Of The Facts"

Relief is also available under AEDPA where the state court predicated its adjudication of a claim on an unreasonable factual determination. Section 2254(d)(2). The statute explicitly limits this inquiry to the evidence that was before the state court.

Even factual determinations that are generally accorded heightened deference, such as credibility findings, are subject to scrutiny for objective reasonableness under § 2254(d)(2). For example, in *Miller El v. Dretke*, 545 U.S. 231 (2005), the Supreme Court ordered habeas relief

11

where the Texas court had based its denial of a *Batson* claim on a factual finding that the prosecutor's asserted race neutral reasons for striking African American jurors were true. *Miller El*, 545 U.S. at 240.

An unreasonable determination of facts exists where, among other circumstances, the state court made its findings according to a flawed process – for example, under an incorrect legal standard, or where necessary findings were not made at all, or where the state court failed to consider and weigh relevant evidence that was properly presented to it. *See Taylor v. Maddox*, 366 F.3d 992, 999 1001 (9th Cir.), cert. denied, 543 U.S. 1038 (2004). Moreover, if "a state court makes evidentiary findings without holding a hearing and giving petitioner an opportunity to present evidence, such findings clearly result in a 'unreasonable determination' of the facts" within the meaning of § 2254(d)(2). *Id.* at 1001; *accord Nunes v. Mueller*, 350 F.3d 1045, 1055 (9th Cir. 2003) (state court's factual findings must be deemed unreasonable under section 2254(d)(2) because "state court . . . refused Nunes an evidentiary hearing" and findings consequently "were made without . . . a hearing"), *cert. denied*, 543 U.S. 1038 (2004); *Killian v. Poole*, 282 F.3d 1204, 1208 (9th Cir. 2002) ("state courts could not have made a proper determination" of facts because state courts "refused Killian an evidentiary hearing on the matter"), *cert. denied*, 537 U.S. 1179 (2003).

A state court factual conclusion can also be substantively unreasonable where it is not fairly supported by the evidence presented in the state proceeding. *See, e.g., Wiggins*, 539 U.S. at 528 (state court's "clear factual error" regarding contents of social service records constitutes unreasonable determination of fact); *Green v. LaMarque*, 532 F.3d 1028 (9th Cir. 2008) (state court's finding that the prosecutor's strike was not racially motivated was unreasonable in light of the record before that court); *Bradley v. Duncan*, 315 F.3d 1091, 1096 98 (9th Cir. 2002) (state court unreasonably found that evidence of police entrapment was insufficient to require an entrapment instruction), *cert. denied*, 540 U.S. 963 (2003).

II.     The Relationship Of § 2254(d) To Final Merits Adjudication

To prevail in federal habeas proceedings, a petitioner must establish the applicability of one of the § 2254(d) exceptions and also must also affirmatively establish the constitutional

12

invalidity of his custody under pre AEDPA standards. *Frantz v. Hazey*, 533 F.3d 724 (9th Cir. 2008) (en banc). There is no single prescribed order in which these two inquiries must be conducted. *Id.* at 736 37. The AEDPA does not require the federal habeas court to adopt any one methodology. *Lockyer v. Andrade*, 538 U.S. 63, 71 (2003).

In many cases, § 2254(d) analysis and direct merits evaluation will substantially overlap. Accordingly, "[a] holding on habeas review that a state court error meets the ' 2254(d) standard will often simultaneously constitute a holding that the [substantive standard for habeas relief] is satisfied as well, so no second inquiry will be necessary." *Frantz*, 533 F.3d at 736. In such cases, relief may be granted without further proceedings. *See, e.g., Goldyn v. Hayes*, 444 F.3d 1062, 1070 71 (9th Cir. 2006) (finding § 2254(d)(1) unreasonableness in the state court's conclusion that the state had proved all elements of the crime, and granting petition); *Lewis v. Lewis*, 321 F.3d 824, 835 (9th Cir. 2003) (finding § 2254(d)(1) unreasonableness in the state court's failure to conduct a constitutionally sufficient inquiry into a defendant's jury selection challenge, and granting petition); *Williams v. Ryan*, 623 F.3d 1258 (9th Cir. 2010) (finding § 2254(d)(1) unreasonableness in the state court's refusal to consider drug addiction as a mitigating factor at capital sentencing, and granting penalty phase relief).

In other cases, a petitioner's entitlement to relief will turn on legal or factual questions beyond the scope of the § 2254(d) analysis. In such cases, the substantive claim(s) must be separately evaluated under a de novo standard. *Frantz*, 533 F.3d at 737. If the facts are in dispute or the existence of constitutional error depends on facts outside the existing record, an evidentiary hearing may be necessary. *Id.* at 745; *see also Earp*, 431 F.3d 1158 (remanding for evidentiary hearing after finding § 2254(d) satisfied).

<u>DISCUSSION</u>

I.      <u>Exclusion of Wiretap Evidence</u>

Petitioner argues that the trial court erred when it excluded evidence that a wiretap investigation had failed to produce incriminating results.

/////

/////

13

1  A.     State Court Decision

2  The California court of appeals rejected this claim in a reasoned decision on direct appeal:

3  A. *Background*

4  During the investigation of the murders, several wiretapping operations were conducted. The People sought to exclude any reference to wiretapping under Evidence Code section 352. While the People opined it was relevant that wiretapping occurred, they claimed the admission of the many recorded messages would consume too much time. In response, Ortez-Lucero argued the failure of the extensive wiretapping operation to produce incriminating evidence was exculpatory and should be admitted as circumstantial evidence of innocence.

9  The People withdrew the objection to admission of the wiretapping evidence. The trial court, however, expressed concern about making the jury listen to multiple wiretaps to prove a negative, and conducted its own relevance inquiry. After the People declined to stipulate that the wiretaps produced no incriminating evidence, the trial court ruled there would be no mention of the wiretapping unless a specific wiretap was identified and a basis for its admission established.

13  The issue was revisited the next day. Strong wanted to admit evidence that there was wiretapping over a period of time after he was identified as a suspect and nothing fruitful was obtained. Ortez-Lucero wanted to question law enforcement about the wiretaps, that they had been "tickled,"[6] and that nothing of evidentiary value was gained from them. The court remained unpersuaded. It found no relevance to the wiretaps and to the extent there was any relevance it was outweighed by the prejudicial effect of causing speculation as to why there was no discussion of the crimes on the wiretaps

18  B. *Analysis*

19  Ortez-Lucero contends the trial court erred in excluding the wiretapping evidence. He contends the absence of incriminating evidence is relevant as a circumstance pointing to innocence. He argues the trial court misunderstand the defense intentions in finding the evidence too time consuming. He intended only to ask a few questions about the existence of the wiretapping and failure to obtain useful information.

23  First, evidence of a lack of incriminating evidence is not always admissible. The general problem with such absence evidence is that there usually exists a variety of reasons to explain the absence, and some of those reasons are not exculpatory. For example, while evidence of flight is admissible to prove a consciousness of guilt, evidence a defendant did not flee has been held inadmissible because

27  ⁶ [footnote five in original text] "Tickling the wire" refers to conducting follow-up interviews and serving search warrants in hopes of generating phone conservations about the crime.

14

"the absence of flight is so ambiguous, so laden with conflicting interpretations, that its probative value on the issue of innocence is slight" and it creates a substantial danger of confusing the issues, or of misleading the jury. (*People v. Green* (1980) 27 Cal.3d 1, 38-39, 164 Cal. Rptr. 1, 609 P.2d 468, overruled on another point in *People v. Martinez* (1999) 20 Cal.4th 225, 83 Cal. Rptr. 2d 533, 973 P.2d 512; *see also People v. Harvey* (1984) 163 Cal.App.3d 90, 114-115, 208 Cal. Rptr. 910 [following *Green*, evidence of defendant's general cooperation with police was properly excluded].)

Here, the probative value of the absence of incriminating statements on the wiretaps was slight. Defendants could have simply been exercising understandable caution in discussing the murders with each other and others, particularly over the telephone. The potential for confusion or an undue consumption of time was significant. Defendants did not make a specific showing as to what law enforcement witnesses would say if permitted to testify about the results of the wiretap; they did not, for example, proffer a report that concluded there were no incriminating or even useful statements recorded. The prosecutor's refusal to so stipulate may have reflected that the wiretap evidence was not as unambiguously clear and helpful to the defense as defendants suggested.[7] Thus, it may have taken more than a few questions to establish (if it was true) that there was nothing on the wiretaps relating to these crimes. This evidence would require an undue consumption of time given the limited probative value of the evidence.

Given the slight probative value of the evidence, and the danger that it would be time consuming or unclear and thus confusing or otherwise misleading, the trial court did not abuse its discretion in excluding the evidence under Evidence Code section 352.

ECF No. 1-1 at 28 – 31. This claim was presented in a petition for review to the California Supreme Court (ECF No. 1-2 at 17-18) which was summarily denied (ECF No. 12-32).

### B. Relevant Federal Law

"[T]he Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'" *Crane v. Kentucky*, 476 U.S. 683, 690 (1986) (quoting *California v. Trombetta*, 467 U.S. 479, 485 (1984)). It is also true, however, that "state and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials." *Holmes v. South Carolina*, 547 U.S. 319, 324 (2006) (quoting *United States v. Scheffer*, 523 U.S. 303, 308 (1998)). "Only rarely [has the Supreme Court] held that the right to present a complete defense was violated by the exclusion of evidence under a state rule of evidence."

---

[7] [footnote six in original text] For example, excerpts from the wiretaps were included in the affidavit in support of the arrest warrant for Strong.

15

*Nevada v. Jackson*, 569 U.S. 505, 509 (2013). "Evidentiary rules do not violate a defendant's constitutional rights unless they 'infring[e] upon a weighty interest of the accused and are arbitrary or disproportionate to the purposes they are designed to serve.'" *Id.* (quoting *Holmes*, 547 U.S. at 324). The Supreme Court has noted that "well-established rules of evidence permit trial judges to exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury." *Holmes*, 547 U.S. at 326.

C.    Analysis

This not an instance where the state court incorrectly applied established federal law. Thus, petitioner is entitled to relief only if the state court's decision was unreasonable. *See Williams v. Taylor*, 528 U.S. 362, 410 (2000) (emphasizing that "an *unreasonable* application of federal law is different from an *incorrect* application of federal law."). A state court's decision cannot be deemed unreasonable if "fairminded jurists could disagree over whether" that decision was correct. *See Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004). A fairminded jurist could conclude, as the state court of appeal did, that the probative value of the wiretap evidence was slight and that the introduction of the evidence "would be time consuming or unclear and thus confusing or otherwise misleading . . . ." ECF No. 1-1 at 31. As the state court noted, it was not clear what the relevant law enforcement witnesses would say if they were permitted to testify. The prosecutor's refusal to stipulate that there were no useful statements might indicate the presence of ambiguities to which significant questioning and testimony would be devoted.

And with respect to the probative value of the evidence, a fairminded jurist could also agree that the failure of the wiretaps to produce incriminating evidence, rather than offering substantial evidence of innocence, might just as easily be indicative of "[petitioner and Strong's] exercising understandable caution in discussing the murders with each other and others, particularly over the telephone." *Id.* The outcome of the botched robbery was spectacularly horrific. The record in the case clearly evidences that it was reported on both local television news (*see*, *e.g.* ECF No. 12-16 at 121) and, eventually, on America's Most Wanted (ECF No.12-18 at 34). Thus, the responsible parties might reasonably conclude that significant resources were

being devoted to investigating the crime and discussing it over the telephone would be unwise.

The state court ruling that whatever slight probative value the evidence could provide was

outweighed by "the danger that it would be time consuming or unclear and thus confusing or

otherwise misleading," ECF No. 1-1 at 31, was not an unreasonable application of federal law.

See *Holmes*, 547 U.S. at 326.

This claim should be rejected.

II.    Exclusion of Third-Party Culpability Evidence

Petitioner argues that the trial court erred when it excluded evidence of Aquitania's

criminal background.  He argues that evidence suggesting that Aquitania was a member of the

Norteno gang suggested third-party culpability which would have potentially exonerated

petitioner.

A.    State Court Decision

The California court of appeals rejected this claim in a reasoned decision on direct appeal:

> Both defendants relied on the defense that someone else committed the crimes. In closing argument, Ortez-Lucero named Noguera as the killer. Strong argued the killer was an Oak Park Blood, and was noncommittal as to whether it was Noguera. On appeal, both defendants contend the trial court erred in hampering their ability to show someone else committed the crimes by excluding evidence of Aquitania's background. Presumably, although never completely developed, the theory was that because Aquitania had been involved in a gang and committed violent crimes, he was more likely to be the victim of a targeted killing (by someone other than defendants) than if his background were pristine.
>
> A. *Background*
>
> Before trial the People moved to exclude any third party culpability evidence, except as to Noguera, unless the defense made a proper pre-trial showing. The People wanted the defense to specify what evidence they intended to elicit about Aquitania's background.
>
> In response, Ortez-Lucero sought to admit evidence elicited at the preliminary hearing that Aquitania was a Norteño gang member, he had committed a home invasion robbery weeks before his death, and in that robbery he used a firearm (borrowed from Gill) to pistol-whip the victim and stole drugs and cash. The defense theory for admitting this evidence was that the motive for the murders was retaliation for Aquitania's criminal activity. This theory was bolstered by Gill's statements to police at the scene that Aquitania gangbanged, Gill thought the attackers were after Aquitania, and that one intruder said

"This is Oak Park Blood."[8]

Ortez-Lucero told the court he was also investigating the role of Thai Dang who had sold cocaine to Gill the night before. Dang had told a nurse his gun was used in the killings. It was agreed that this angle was too undeveloped at that time and should be revisited later.

The People stated they would present evidence that Gill's residence was a drug house, but Aquitania's background was a separate issue. They argued such background evidence was character evidence, inadmissible under Evidence Code section 1101, subdivision (a). The court granted the People's motion to exclude the background evidence, noting there was no evidence that Aquitania went to Gill's house that day for any nefarious purpose and the introduction of the background evidence would give rise to speculation.

In arguing for a pinpoint instruction on third party culpability after the evidence was complete, Ortez-Lucero brought up the evidence of Dang's statement that his gun was used in the killings, Dang's MySpace page displaying weapons and his possession of a book entitled "Living with Glocks." Further, Dang had been at Gill's the night before the shootings conducting a drug deal. All of this evidence was before the jury. The trial court did not want to entertain a motion to re-open the evidence on third party culpability and said that the evidence concerning Dang was insufficient to warrant an instruction thereon.

B. *Analysis*

"To be admissible, the third-party evidence need not show 'substantial proof of a probability' that the third person committed the act; it need only be capable of raising a reasonable doubt of defendant's guilt. At the same time, we do not require that any evidence, however remote, must be admitted to show a third party's possible culpability. As this court observed in [*People v. Mendez* (1924) 193 Cal. 39, 223 P. 65], evidence of mere motive or opportunity to commit the crime in another person, without more, will not suffice to raise a reasonable doubt about a defendant's guilt: there must be direct or circumstantial evidence linking the third person to the actual perpetration of the crime." (*People v. Hall* (1986) 41 Cal.3d 826, 833, 226 Cal. Rptr. 112, 718 P.2d 99.) "In assessing an offer of proof relating to such evidence, the court must decide whether the evidence could raise a reasonable doubt as to defendant's guilt and whether it is substantially more prejudicial than probative under Evidence Code section 352." (*People v. Bradford* (1997) 15 Cal.4th 1229, 1325, 65 Cal. Rptr. 2d 145, 939 P.2d 259.)

The trial court did not abuse its discretion in excluding evidence of Aquitania's unsavory past. Evidence that Aquitania was a gang member and had recently committed a violent robbery, using a gun

---

[8] [footnote three in original text] The testimony about the statement varied. At trial Gill admitted he had *told* the detective the African American intruder said "Oak Park Bloods," but denied he had actually *heard* it. Palmer did not hear that intruder reference Bloods.

and stealing drugs and money, was insufficient to link someone other than defendants to the crimes. At most, it suggests a possible motive by another unknown person, which is not enough to merit an instruction. The instant case is similar to *People v. Edelbacher* (1989) 47 Cal.3d 983, 254 Cal. Rptr. 586, 766 P.2d 1, where the defense offered evidence that the murder victim had asked about buyers for marijuana and her mother had been unhappy that she spent time with "'Hell's Angel-type people.'" This evidence was offered "'to show by circumstantial evidence the possible motive of third parties to commit the crime and circumstantial evidence as to possible identity of third parties to commit the crime.'" (*Id.* at p. 1017.) Our Supreme Court held the evidence was properly excluded. "[D]efendant's proposed evidence did not identify a possible suspect other than defendant or link any third person to the commission of the crime. The evidence did not even establish an actual motive but only a possible or potential motive for [the victim's] murder." (*Id.* at p. 1018.) The same is true here.

Nor did the exclusion of this evidence constitute a refusal to allow defendants to present a third party culpability defense. There was considerable evidence linking Noguera to the crimes. The prosecutor told the jury to assume that Noguera was an accomplice and focused his argument on the corroborating evidence. The prosecutor conceded there was evidence suggesting that Noguera "is in this up to his eyebrows," but argued he was not the murderer because he was not at the scene.

Strong argues the trial court erred in not allowing defendants to develop a defense theory of third party culpability as to Dang. The exact nature of the alleged error is not clear. Strong does not argue that the trial court's assessment of the Dang evidence as insufficient for third party culpability was in error. Nor does he identify what additional evidence the defense proposed to offer on Dang. Strong has failed to show error.

ECF No. 1-1 at 18-21. This claim was presented in a petition for review to the California Supreme Court (ECF No. 1-2 at 16-17) which was summarily denied (ECF No. 12-32).

B. Relevant Federal Law

This claim, given that it is also based on exclusion of evidence, is broadly governed by the same federal law identified above in the discussion of the exclusion of the wiretap evidence.

With respect to third-party culpability specifically, the Supreme Court has previously held that exclusion of third-party confessions violated due process when they bore persuasive assurances of trustworthiness and were crucial to the defense. *Chambers v. Mississippi*, 410 U.S. 284, 300-02 (1973). *Chambers* explicitly indicated, however, that it did not establish any new principles of constitutional law; rather it held only that the facts and circumstances of that

19

particular case deprived the petitioner of a fair trial. *Id.* at 302-03. More broadly, however, the Supreme Court has recognized that third-party culpability evidence may be excluded where it fails to sufficiently connect another person to the crime – this may occur when the evidence is speculative, remote, or does not tend to prove or disprove a material fact at issue. *See Holmes*, 547 U.S. at 327.

C.    <u>Analysis</u>

As with the foregoing wiretap evidence exclusion claim, the relevant question is whether fairminded jurists could disagree as to the correctness of the state court's adjudication of this claim. This court concludes that they could. The theory that Aquitania's killing was undertaken by an unknown actor(s) in retaliation for his gang activity was, as the state court found, not specifically supported. Petitioner never identified any potential killers from a rival gang. Nor was there any concrete evidence indicating that the killing of Aquitania was a targeted, gang-related assassination. At best, the evidence of Aquitania's gang affiliation and past criminal activity raised only the vague, speculative possibility that he had been killed for gang related reasons. The Ninth Circuit, interpreting established federal law, has previously concluded that exclusion of such speculative evidence does not render a petitioner's trial unfair. *See Spivey v. Rocha*, 194 F.3d 971, 978 (9th Cir. 1999) (holding that evidence of victim's gang affiliation was properly excluded insofar as it "[did] not identify a possible suspect or link any third party to the murder, or establish an actual motive rather than a possible or potential motive."). Thus, the state court's determination that petitioner's theory of third-party culpability was too speculative to warrant admission of evidence of Aquitania's gang affiliations was not unreasonable.

III.    <u>Denial of Third-Party Culpability Jury Instruction</u>

Petitioner argues that the trial court erred when it rejected the instruction:

> If you find that there is direct or circumstantial evidence that links another perpetrator or perpetrators to the charged crime, you may consider that evidence in determining whether the People have proved the defendant's guilt beyond a reasonable doubt.

ECF No. 1 at 13. He also argues that his trial counsel was constitutionally ineffective for failing to timely request the foregoing instruction.

20

## A.  State Court Decision

The California court of appeal rejected this claim in a reasoned decision on direct appeal:

> Defendants contend the trial court erred in denying the request to instruct the jury on third party culpability because that was the crux of the defense. Recognizing that one reason the court declined the instruction was that it was proposed after the trial court's deadline for instruction submissions had passed, Ortez-Lopez contends that if counsel was untimely in proposing the instruction, he was denied effective assistance of counsel.

> A. *Background*

> The day after the trial court instructed the jury, Ortez-Lucero requested a pinpoint instruction on third party culpability.4Link to the text of the note Counsel claimed he had intended to include it with the package of instructions and had told the court he had an additional one. The court disagreed with that history, recalling that when counsel asked if he could think about the instructions overnight, the court said no, they were final. The People objected to the instruction because it was untimely and thus would highlight the defense theory. The People argued the instruction was unnecessary as the reasonable doubt instructions were sufficient. The trial court denied the motion to add the third party culpability instruction.

> Ortez-Lucero raised the failure to give the third party culpability instruction in his motion for a new trial. The trial court denied the motion.

> B. *Analysis*

> Because Ortez-Lucero claims trial counsel was ineffective if the request for the instruction was untimely, we do not address the timeliness issue; instead, we focus on any prejudice that might have resulted from counsel's failure to request the instruction. In other words, we analyze whether the instruction's absence was prejudicial to defendants. This is the same analysis as we would apply to the question of whether the trial court prejudicially erred in refusing to give the instruction. "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." (*Strickland v. Washington* (1984) 466 U.S. 668, 697 [104 S. Ct. 2052, 80 L.Ed.2d 674, 699].)

> "'[I]n appropriate circumstances' a trial court may be required to give a requested jury instruction that pinpoints a defense theory of the case by, among other things, relating the reasonable doubt standard of proof to particular elements of the crime charged. [Citations.] But a trial court need not give a pinpoint instruction if it is argumentative [citation], merely duplicates other instructions [citation], or is not supported by substantial evidence [citation]. An instruction that does no more than affirm that the prosecution must prove a particular element of a charged offense beyond a reasonable doubt merely duplicates the standard instructions defining the

charged offense and explaining the prosecution's burden to prove guilt beyond a reasonable doubt. Accordingly, a trial court is required to give a requested instruction relating the reasonable doubt standard of proof to a particular element of the crime charged only when the point of the instruction would not be readily apparent to the jury from the remaining instructions." (*People v. Bolden* (2002) 29 Cal.4th 515, 558-559, 127 Cal. Rptr. 2d 802, 58 P.3d 931.)

Evidence of third party culpability simply supports a theory that defendant did not commit the criminal act charged—that is, the prosecution did not prove its case beyond a reasonable doubt. When our Supreme Court encountered the failure to give a requested pinpoint instruction on third party culpability, it concluded any error from not giving the pinpoint instruction was harmless because the trial court had adequately instructed the jury on reasonable doubt, and the jury understood from defense counsel's argument defendant's theory that someone else committed the crime. (*People v. Earp* (1999) 20 Cal.4th 826, 886-887, 85 Cal. Rptr. 2d 857, 978 P.2d 15.) In *People v. Hartsch* (2010) 49 Cal.4th 472, 110 Cal. Rptr. 3d 673, 232 P.3d 663, our Supreme Court noted third party culpability "instructions add little to the standard instruction on reasonable doubt," and further "that even if such instructions properly pinpoint the theory of third party liability, their omission is not prejudicial because the reasonable doubt instructions give defendants ample opportunity to impress upon the jury that evidence of another party's liability must be considered in weighing whether the prosecution has met its burden of proof." (*Id.* at p. 504.) "It is hardly a difficult concept for the jury to grasp that acquittal is required if there is a reasonable doubt as to whether someone else committed the charged crimes." (*Ibid.*; accord, *People v. Covarrubias* (2016) 1 Cal.5th 838, 907-908, 207 Cal. Rptr. 3d 228, 378 P.3d 615; *People v. Mackey* (2015) 233 Cal.App.4th 32, 111, 182 Cal. Rptr. 3d 401.)

Strong contends this line of cases is distinguishable because here the jury knew that although Noguera had been arrested for these crimes, all charges against him had been dismissed. Strong argues there was no reasonable probability that the jury would have found Noguera culpable for the crimes because the State had vindicated him and removed him as possible culprit. This argument fails to persuade. In every case where defendant asserts third party culpability, the jury knows the State does not believe the third party was the sole culprit, because the State is prosecuting defendant, not the third party. Moreover, here there was no vindication of Noguera because the People did not claim Noguera was without any responsibility for the crimes. Instead, the People admitted Noguera's possible culpability in closing argument. Finally, the jury was told that Noguera was granted use immunity to testify, which clearly indicated his possible culpability in at least some aspects of the charged crimes.

ECF No. 1-1 at 21-24. This claim was presented in a petition for review to the California

Supreme Court (ECF No. 1-2 at 35-41) which was summarily denied (ECF No. 12-32).

/////

B.     <u>Relevant Federal Law</u>

1.     <u>Instructional Error</u>

"It is not the province of a federal court to reexamine state court determinations of state law questions." *Estelle v. McGuire*, 502 U.S. 62, 71-72 (1991). With respect to jury instructions, the Supreme Court has held that:

> The burden of demonstrating that an erroneous instruction was so prejudicial that it will support a collateral attack on the constitutional validity of a state court's judgment is even greater than the showing required to establish plain error on direct appeal. The question in such a collateral proceeding is "whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process," not merely whether "the instruction is undesirable, erroneous, or even 'universally condemned.'"

*Henderson v. Kibbe*, 431 U.S. 145, 154 (1977) (quoting *Cupp v. Naughten*, 414 U.S. 141, 147 (1973)). A petitioner challenging a failure to give an instruction bears an "especially heavy" burden because "[a]n omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the law." *Id.* at 155.

2.     <u>Ineffective Assistance of Counsel</u>

The clearly established federal law governing ineffective assistance of counsel claims is that set forth by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984). To succeed on a *Strickland* claim, a defendant must show that (1) his counsel's performance was deficient and that (2) the "deficient performance prejudiced the defense." *Id.* at 687. Counsel is constitutionally deficient if his or her representation "fell below an objective standard of reasonableness" such that it was outside "the range of competence demanded of attorneys in criminal cases." *Id.* at 687-88 (internal quotation marks omitted). "Counsel's errors must be 'so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.'" *Richter*, 562 U.S. at 104 (quoting *Strickland*, 466 U.S. at 687).

Prejudice is found where "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. A reasonable probability is "a probability sufficient to undermine confidence in the

/////

outcome." *Id.* "The likelihood of a different result must be substantial, not just conceivable." *Richter*, 562 U.S. at 112.

C.    Analysis

The state court was reasonable in concluding that the failure to give petitioner's desired instruction was harmless.[9]  A fairminded jurist could find that the third-party culpability instruction was effectively duplicative of the reasonable doubt instruction that was given.[10]  As the state court noted, if the jury came to believe that someone else committed the murders then it necessarily harbored, at the very least, a reasonable doubt that petitioner was guilty and would have been obligated to acquit him.  Thus, petitioner cannot show that his due process rights were violated by the failure to give his desired instruction.  *See United States v. Toro-Barboza*, 673 F.3d 1136, 1147 (9th Cir. 2012) ("Although a defendant may ask the court to instruct the jury on his theory of defense, and should get a suitable instruction if the theory is supported by law and some evidence, a court may reject a defendant's requested instruction if other instructions reasonably cover the theory of the defense."); *Winn v. Lamarque*, 499 F. App'x 699, 700 (9th Cir. 2012) ("The Court of Appeal held that it was unnecessary for the trial court to give an instruction

---

[9] The Supreme Court has held that "harmless-error analysis applies to instructional errors so long as the error at issue does not categorically "vitiate[e] *all* the jury's findings."" *Hedgpeth v. Pulido*, 555 U.S. 57, 61 (2008) (quoting *Neder v. United States*, 527 U.S. 1, 11 (1999)).

[10] The trial court instructed:

A defendant in a criminal case is presumed to be innocent. This presumption requires that the People prove a defendant guilty beyond a reasonable doubt. Whenever I tell you the People must prove something, I mean they must prove it beyond a reasonable doubt, unless I specifically tell you otherwise.

Proof beyond a reasonable doubt is proof that leaves you with an abiding conviction that the charge is true. The evidence need not eliminate all possible doubt because everything in life is open to some possible or imaginary doubt.

In deciding whether the People have proved their case beyond a reasonable doubt, you must impartially compare and consider all the evidence that was received throughout the entire trial. Unless the evidence proves a defendant guilty beyond a reasonable doubt, he is entitled to an acquittal and you must find him not guilty.

ECF No. 12-5 at 148.

on third-party culpability, in part because the other instructions made it sufficiently clear that the prosecution had to prove beyond a reasonable doubt that Winn killed the victim. That holding was not violative of the Due Process Clause.") (unpublished decision).

The foregoing analysis also forecloses petitioner's ineffective assistance of counsel claim insofar as he cannot demonstrate that his trial counsel's failure to timely request the third-party culpability instruction prejudiced him.

IV.     Trial Court's Advisement to the Jury that Jermaine Hollie Refused to Testify

Petitioner contends that he was prejudiced when the trial court informed the jury that Jermaine Hollie refused to testify. He claims that the jury likely considered Hollie's refusal as evidence of his guilt.

A.     State Court Decision

The California court of appeals rejected this claim in a reasoned decision on direct appeal:

> *Hollie's Refusal to Testify*
>
> Ortez-Lucero contends the trial court erred in telling the jury that Jermaine Hollie refused to testify. He argues he was prejudiced because the jury would consider Hollie's refusals as evidence of his guilt. Although the court also told the jury not to draw any negative inference from Hollie's refusal to testify, Ortez-Lucero contends that was "too much" to ask of jurors.
>
> A. *Background*
>
> Hollie was serving a prison sentence and was brought to court multiple times to testify. He repeatedly refused to testify, despite the finding of both the court and his appointed attorney that he had no Fifth Amendment privilege and the court repeatedly holding him in contempt and fining him. Hollie claimed the reason he was not testifying was because he had a problem with granting immunity to Noguera who had admitted he had "beat his girlfriend" and committed "these 27 murders and these murders right here."
>
> Hollie was a logical witness for the prosecution, particularly as to whether Strong had been shot. Noguera testified that Hollie brought a woman to Ortez-Lucero's house to remove the bullet from Strong's leg. Hollie's wife testified Hollie asked her to help a friend and took her to a house where she cleaned a man's injured leg that had a hole in it.
>
> The parties and court discussed how to handle Hollie's refusal to testify. Ortez-Lucero proposed telling the jury that Hollie was unavailable as a witness and the jury was not to draw an adverse inference against either side. The prosecutor disagreed that Hollie

25

was unavailable. Later, the court cited case law that the jury could draw a negative inference from a witness's refusal to testify where there was no valid privilege. The prosecutor asked for an instruction that the jury was to draw no inference from Hollie not testifying, but he emphasized he wanted to explain to the jury why he had not called Hollie as a witness. Ortez-Lucero continued to request that the jury be told Hollie was unavailable as a witness; he argued no negative inference could be drawn because the reason Hollie's refused to testify was not to protect the defendants. The court proposed two possible solutions: the People could call Hollie as a witness and if he refused to be sworn, he would not be allowed to make any statements, or the court would adopt the People's proposal. Counsel conferred and came up with what Ortez-Lucero's counsel called a "livable solution."

The court admonished the jury in the language on which counsel had agreed: "Ladies and gentlemen of the jury, on multiple occasions during this trial Jermaine Hollie has been called to the witness stand outside your presence. On each such occasion, he has refused to take the oath and be questioned, in spite of my orders to do so and in spite of my finding that his actions constituted a contempt of court. [¶] You are not to draw any adverse inferences against either side by virtue of Mr. Hollie's refusal to testify."

B. *Analysis*

Ortez-Lucero contends it was prejudicial error to tell the jury that Hollie had refused to testify because that fact was irrelevant. A witness's silence is relevant only if it leads to a reasonable inference. Here, Ortez-Lucero contends, the reason for Hollie's silence was speculative, so his silence was irrelevant. (See *People v. Babbitt* (1988) 45 Cal.3d 660, 682, 248 Cal. Rptr. 69, 755 P.2d 253 [evidence that produces only speculative inferences is irrelevant evidence].) He argues that once the jury was told Hollie refused to testify, it could not ignore that fact, despite the admonition not to draw any negative inferences.

"Once a court determines a witness has a valid Fifth Amendment right not to testify, it is, of course, improper to require him to invoke the privilege in front of a jury; such a procedure encourages inappropriate speculation on the part of jurors about the reasons for the invocation. . . . But where a witness has no constitutional or statutory right to refuse to testify, a different analysis applies. Jurors are entitled to draw a negative inference when such a witness refuses to provide relevant testimony." (*People v. Lopez* (1999) 71 Cal.App.4th 1550, 1554, 84 Cal. Rptr. 2d 655.)

Strong admitted on cross-examination that Hollie was "kinda" an older brother to him and a friend to Ortez-Lucero, so it would have been reasonable for the jury to draw the inference that Hollie refused to testify to protect defendants. To prevent this, counsel agreed the court should instruct the jury not to draw any negative inference. We presume the jury follows the court's instructions. (*People v. McKinnon* (2011) 52 Cal.4th 610, 670, 130 Cal. Rptr. 3d 590, 259 P.3d 1186.)

26

> Ortez-Lucero's agreement to the instruction bars his claim of error. When a defense attorney makes a conscious and deliberate tactical decision to request a particular instruction, the invited error doctrine bars an argument on appeal that the instruction was error. (*People v. Wader* (1993) 5 Cal.4th 610, 657-658, 20 Cal. Rptr. 2d 788, 854 P.2d 80.) Here, the decision on instructing the jury about Hollie's refusal to testify was a deliberate tactical decision, as the matter was discussed and the option chosen was agreed-upon by all, to the exclusion of other options.
>
> Ortez-Lucero asserts he did not agree to the instruction, but only accepted it as the less objectionable of the two proposals offered by the trial court. The record does not support this view that Ortez-Lucero did not fully agree to the instruction or maintained his objection. Counsel stated the agreement on the language to instruct the jury on Hollie's refusal to testify was a "livable solution." His argument on appeal to the contrary is precluded by his agreement below.

ECF No. 1-1 at 26-29. This claim was presented in a petition for review to the California Supreme Court (ECF No. 1-2 at 13-16) which was summarily denied (ECF No. 12-32).

### B. Relevant Federal Law

This claim, given that it is also based on instructional error, is broadly governed by the same federal law identified above in the discussion of the denial of a third-party culpability instruction.

### C. Analysis

Here (as noted *supra*), the trial court admonished, with respect to Mr. Hollie:

> All right. Ladies and gentlemen of the jury, on multiple occasions during this trial Jermaine Hollie has been called to the witness stand outside of your presence. On each such occasion, he has refused to take the oath and be questioned, in spite of my orders to do so and in spite of my finding that his actions constituted a contempt of court.
>
> You are not to draw any adverse inferences against either side by virtue of Mr. Hollie's refusal to testify.

ECF No. 12-23 at 92. Petitioner argues that this admonition – insofar as it informed the jury that Hollie was refusing to testify - created "the likelihood of a negative inference against [petitioner] where there should have been none." ECF No. 1 at 22. But it is well established that, outside of

/////

/////

27

exceptional circumstances,[11] juries are presumed to follow their instructions. *Richardson v. Marsh*, 481 U.S. 200, 211 (1987). In light of that presumption, it is incumbent upon petitioner to offer some concrete evidence that the circumstances of his case were so exceptional as to warrant departing from it. He has failed to do so.[12]

V.     Cumulative Error

Finally, petitioner contends that, even if the foregoing claims of error do not individually require reversal, their cumulative effect still rendered his trial fundamentally unfair. However, given this court's finding that no error of constitutional magnitude occurred, it must deny his claim of cumulative error. *See Hayes v. Ayers*, 632 F.3d 500, 524 (9th Cir. 2011) ("Because we conclude that no error of constitutional magnitude occurred, no cumulative prejudice is possible.")

CONCLUSION

For all the reasons explained above, the state courts' denial of petitioner's claims was not objectively unreasonable within the meaning of 28 U.S.C. § 2254(d). Accordingly, IT IS HEREBY RECOMMENDED that the petition for writ of habeas corpus be denied.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any reply to the objections shall be served and filed within fourteen days after service of the objections. Failure to file

---

[11] For instance, in *Bruton v. United States*, the Supreme Court determined that a defendant was deprived of his right of confrontation when an incriminating confession of a nontestifying codefendant was introduced at their joint trial, even though the jury was instructed to consider the confession *only* against the codefendant. 391 U.S. 123, 126 (1968). Needless to say, the circumstances in the case at bar are not as exceptional.

[12] Petitioner also argues that, to the extent his trial counsel "invited the error on the instruction relating to Hollie's refusal to testify, to do so was ineffective assistance of counsel." ECF No. 1 at 24. Given that he cannot demonstrate that he was prejudiced by the court's admonishment with respect to Hollie, he cannot succeed with such a claim under *Strickland*.

objections within the specified time may waive the right to appeal the District Court's order. *Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991). In his objections petitioner may address whether a certificate of appealability should issue in the event he files an appeal of the judgment in this case. *See* Rule 11, Rules Governing Section 2254 Cases (the district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant).

DATED: November 5, 2019.

EDMUND F. BRENNAN
UNITED STATES MAGISTRATE JUDGE